IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | Civil Action No. |
| vs. | § § § | |
| JON C. GINDER, NORTHAMERICAN ENERGY GROUP, INC., AND NORTHAMERICAN ENERGY GROUP, CORP., | § § § § § | |
| Defendants. | § § § | |

## COMPLAINT

The United States Securities and Exchange Commission ("Commission") files suit against Defendants Jon C. Ginder, Northamerican Energy Group, Inc., and Northamerican Energy Group, Corp., and would respectfully show the Court as follows:

## SUMMARY

1.  From February 2008 to May 2010, Jon C. Ginder fraudulently raised approximately $3.5 million from over 50 investors nationwide through three unregistered oil and gas limited partnership offerings. Ginder solicited investors through television advertisements on CNBC and Fox Business Channel touting annual returns of 40% from "low risk producing wells." Offering documents for the first offering claimed that "based upon historical data and documented cases the actual production increases may be significantly higher than anticipated returns [of 39% to over 48%]." Ginder's representations were fraudulent on their face because the historical oil and gas production from the partnership leases was very poor, many of the wells had no recent production history and Ginder had no reasonable basis for such speculative claims.

2. Ginder's misrepresentations were not limited solely to wildly optimistic projections of oil production from marginal wells. In connection with the first offering that raised in excess of $2.4 million, offering documents claimed that investor funds would be used only for partnership purposes, specifically to purchase leases and renovate existing wells to "further enhance monthly production." The documents represented that all expenditures in excess of $50,000 per well required approval of 75% of the partners, and that his company Northamerican Energy Group, Inc., which served as general partner, would "not make any money unless you, our partners, make money by sharing in the profits." Contrary to these representations, Ginder utilized $800,000 of investor funds to purchase leases from a private company he controlled for an undisclosed profit of approximately $700,000 in cash plus an additional ten partnership units worth $60,000 per unit – in essence an undisclosed profit of $1.3 million. Further, without the partners' approval, Ginder withdrew $300,000 from the partnership's operating account to make an unsecured and non-interest bearing "loan" to a penny stock company operated by a personal friend and in which Ginder owned stock. The general partner has also "borrowed" over $478,000 from the partnership. None of these funds were repaid to the partnership. Ginder also paid an offshore firm at least $210,000 of investor funds for the television advertising campaign that generated investor leads for the offering. None of the above expenditures, which total approximately 70% of the offering proceeds, were approved by investors.

3. Ginder raised $900,000 in another of the limited partnership offerings. Unlike the other offerings, the limited partnership is merely a passive investor in an entity engaged in oil and gas exploration. In connection with this offering, Ginder made material omissions

concerning his prior activities, including the fact that he misapplied funds from the first partnership.

4. The Commission, in the interest of protecting investors from any further illegal activity, brings this action against the Defendants seeking emergency orders freezing assets, appointing a receiver and providing other equitable relief as well as preliminary and permanent injunctive relief, disgorgement of all illicit profits and benefits Defendants received plus prejudgment interest and civil monetary penalties.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to § 22(a) of the Securities Act of 1933 (the "Securities Act") and § 27 of the Securities Exchange Act of 1934 (the "Exchange Axt"). Defendants, directly and indirectly, made use of the mails and of the means and instrumentalities of interstate commerce in connection with the acts, practices and courses of business described in this Complaint. Venue is proper because many of the transactions, acts, practices and courses of business described below occurred within the jurisdiction of the Southern District of Texas.

## PARTIES

6. **Jon C. Ginder** ("Ginder"), age 67, is a resident of Houston, Texas, and is the President and CEO of the Northamerican Energy Group, Inc. and Northamerican Energy Group, Corp. Ginder also operates oil and gas leases under an assumed name, Northamerican Service Group ("NSG").

7. **Northamerican Energy Group, Inc.,** ("NEG") is a Nevada corporation incorporated by Ginder in March 2004, with its principal place of business in Houston, Texas. NEG is the general partner of two limited partnerships, Northamerican Energy Group Master Limited Partnership ("MLP") and Northamerican Energy Group Master Limited Partnership II

("MLP II"). In approximately December 2009, Ginder ceased the MLP II offering and put MLP II investors into MLP.

8. **Northamerican Energy Group, Corp.,** ("NEGC") is a Nevada corporation incorporated by Ginder in March 1997, with its principal place of business in Houston, Texas. NEGC is the general partner of the Sweet Limited Partnership, one of the limited partnerships formed by Ginder.

## BACKGROUND FACTS

9. Ginder formed three limited partnerships and solicited investors to purchase units in the partnerships using fraudulent offering documents. None of the offerings were registered with the Commission and Ginder solicited investors through a general solicitation. The three partnerships Ginder formed were the Northamerican Energy Group Master Limited Partnership ("MLP"), the Northamerican Energy Group Master Limited Partnership II ("MLP II") and the Sweet Limited Partnership.

## THE MLP OFFERING

10. Ginder formed MLP in February 2008 for the purpose of acquiring seven oil and gas leases with the intent of repairing and reworking the wells on the leases to make them commercially productive. According to the Private Placement Memorandum (PPM) prepared by Ginder, 100 limited partnership units were offered at $60,000 per unit for a total offering of $6 million. Ginder, under his assumed name of NSG, would operate the wells and NSG and NEG would be paid a total fee of 5% of the net oil and gas revenue. NEG would also receive 25% of the net operating income. All funds received from investors were to be used to purchase leases and perform the work necessary to make the wells commercially profitable.

11. Investors in MLP were publicly solicited through television advertisements aired on CNBC and Fox Business News, despite the fact that the MLP offering memorandum clearly stated "NO PUBLIC SOLICITATION OR ADVERTISING IN ANY FORM WHATSOVER MAY BE EMPLOYED IN THE OFFERING OF THE UNITS...." Ginder paid a Belize company for the advertising campaign. Ginder reviewed a version of the advertisement prior to its use. The advertisements claimed investors could earn annual returns of 40% from "low risk producing wells." The names and telephone numbers of prospective investors who responded to the advertisements were forwarded to Ginder, who then personally called each prospect. The MLP subscription documents made no inquiry into the accreditation status or investment experience of potential investors. With Ginder's knowledge, one investor took out a mortgage on his residence to raise funds to invest, and another investor, a former railroad worker, invested $60,000 received as a result of the settlement of a job related injury. In all, approximately 44 investors residing in at least 17 states purchased a total of 53 partnership units allowing Ginder to raise in excess of $2.4 million in investor funds.

12. In the MLP offering, Ginder made numerous material misrepresentations and omissions regarding expected returns. The PPM projected "conservative" annual returns ranging from 35% to 48% for the first year and an average of 30% to 39% during the next 10 years. These returns were based on estimated *annual* production of approximately 91,000 barrels of oil. According to the PPM, the anticipated returns were "based upon historical data and documented cases." Ginder failed to disclose that the historical production figures for the leases show that since January 1993 the 15 year *total* production from the leases was only 67,000 barrels of oil. Nor did Ginder disclose the basis he used for the wildly fantastic projection that reworking the wells could possibly lead to an annual production rate of 91,000 barrels. The reason he failed to

disclose the basis for this projection is simple: he had none. There were no reserve reports or any other credible basis upon which he could form a reasonable belief that the wells could be reworked to yield a production rate in a single year that would exceed over 135% of the prior combined 15 years worth of productivity.

13. The actual production of the wells after the formation of the partnership confirms that Ginder had no reasonable basis for the projections he used to mislead investors. Even after purportedly reworking several of the partnership wells, the partnership's total production for 2008, the first year of operation, was approximately 3,522 barrels of oil, compared to the 91,000 barrels projected in the PPM. The partnership's total production for 2009 was only 3,986 barrels of oil. Ginder knew by at least the second quarter of 2008 that the partnership was not meeting its anticipated returns, yet, he continued to raise funds for MLP until at least March 2010, using the same false and misleading projections and not disclosing that the partnership was operating at a loss.

14. Although the partnership has never earned a profit, Ginder nevertheless distributed approximately $18,000 to the initial MLP investors for the second quarter 2008 (the first quarter of partnership operations). In his cover letter, Ginder referred to the enclosed check as "a prorated distribution of Partners Net Operation income." An accompanying partnership financial statement, however, reflects that the partnership had a net loss for the quarter of $144,000. The actual source of the distribution was an oil and gas revenue check. Ginder made the distribution without deducting any expenses and at the same time also inappropriately paid approximately $18,000 to NEG for its share of "net income." Ginder thereafter fraudulently represented to new investors that the partnership had made a distribution. In a letter to a prospective investor dated August 27, 2008, Ginder stated "the distribution of quarterly

partnership income for [MLP] was scheduled for, and completed, on July 31, 2008... [g]iven the current, and projected, price of oil we are confident the Partnerships annual income with meet, or exceed, all expectations...." There was no disclosure that the partnership suffered an operating loss for the quarter or that the distribution was a sham.

15. The MLP offering materials also contained the following representations regarding the use of partnership funds:

- the purpose of the partnership was to invest in, and operate producing oil and gas leases, and that checks drawn upon the partnership account or accounts would <u>only</u> be used for partnership purposes;

- partnerships funds "will be used as they are received to begin workovers, renovations, equipment replacement, perforate new pay zones (both gas and oil) chemically treat wells and effect all methods necessary to further enhance the monthly production;"

- "that except in the case of an emergency, **ALL EXPENDITURES IN EXCESS OF $50,000 PER WELL REQUIRE THE APPROVAL OF 75% OF THE PARTNERS**" (emphasis in original); and

- "we [NEG] get reimbursed only for our costs and expenses. We do not make any money unless you, our partners, make money by sharing in the profits. The more money you make, the more money we make."

16. In one of his very first acts as general partner, however, Ginder in June 2008 wrote three consecutive numbered checks from the MLP account in the amount of $100,000 each to a Bulletin Board traded company founded by his friend and in which Ginder owned stock. Without the approval of the partners, Ginder made a non-interest bearing loan to the company.

Despite the fact that the loan was made in breach of his duties as general partner and without partnership approval, Ginder caused the loan to appear as a receivable from the company on the partnership balance sheet mailed to investors in July 2008. After several investors complained to Ginder, he asserted that he made the loan because the $300,000 was not needed by the partnership, it was not earning much interest in the partnership's money market account, and the loan would benefit the partnership because his friend had connections with a large oil company. He failed to disclose, however, that at the time the loan was made, it was unsecured, earning no interest and that Ginder was a shareholder in the company. After the company failed to repay the loan, NEG assumed the obligation to repay the money and pledged its assets against the debt. The loan remains unpaid to the partnership.

17.     Ginder also made unauthorized payments of investor funds to NEG, the general partner. Ginder failed to open a separate partnership bank account until April 2008, two months after forming the partnership. During the interim, he raised approximately $240,000, all of which he deposited into a personal account styled "Jon Ginder d/b/a Northamerican Energy Group." After opening the partnership account, he transferred an additional $1.1 million from the partnership account to the NEG "d/b/a" account, $800,000 of which was for the acquisition of seven oil and gas leases that he transferred to the partnership. Although the PPM represented that NEG owned specific oil and gas production leases that it intended to transfer to the partnership, it contained absolutely no disclosure that NEG would be paid for the leases or the profit to be made by NEG from the transaction. Ginder's cost basis in the leases, on information and belief, is approximately $100,000. In addition to transferring to himself the $800,000 in cash for the leases, he also transferred 10 MLP partnership units valued at $60,000 each.

Accordingly, Ginder realized an undisclosed profit of approximately $1.3 million from NEG's transfer of the seven oil and gas leases to the partnership.

18. Bank records also reflect that rather than using the funds "earned" on the sale of leases to repay the loan assumed by NEG, Ginder used approximately $280,000 of investor funds to acquire two office buildings to house his oil and gas operations. Just recently, MLP investors were advised that they are also being charged $1,500 a month for leasing the building that Ginder used their funds to purchase. Contrary to his statement that NEG would only make money when investors did, Ginder continues to profit at investors' expense.

19. Finally, Ginder paid $210,000 of investor funds to the offshore promotional firm that produced the television advertisements for the offering. As with the other unauthorized expenses, this expenditure was not disclosed in the PPM and never approved by investors.

## THE MLP II OFFERING

20. In June 2008, Ginder formed a second $6 million limited partnership offering, MLP II, which was structured like MLP, and he also publicly solicited investors through television advertisements. Ginder again promised astronomical returns, purportedly based on historical figures. Ginder had no support for the projections made to prospective investors. In addition, there was no disclosure of NEG's initial partnership offering and the fact that investor funds had been misused, that the MLP partnership failed to meet its projected returns or that it operated at a loss. Only two investors purchased units at $60,000 each in MLP II. In approximately February 2009, Ginder ceased the offering and transferred the investors' interests to MLP. No leases were ever purchased by or conveyed to MLP II.

## THE SWEET LIMITED PARTNERSHIP OFFERING

21. In December 2009, Ginder began selling partnership units in the Sweet Limited Partnership (the "Sweet" offering or partnership). Ginder offered 18 limited partnership units at $50,000 per unit. The general partner of the limited partnership is NEGC. Ginder fully subscribed the partnership raising $900,000 from approximately nine investors, including two investors from MLP. Ginder also used $35,000 remaining from the MLP offering to purchase a partial unit in the Sweet partnership in the name of MLP, without MLP partnership approval. Unlike the first two partnership offerings, neither Ginder nor any of his companies had any role in the acquisition of the lease, or the drilling and operation of the Sweet partnership well. The contractor and operator on the well is a third party company and the Sweet partnership is merely a passive investor in the well for which it received an approximate 19% working interest. According to the PPM, NEGC will receive a 3% management fee and 25% of the partnership's Net Operating Revenue.

22. As in the first two offerings, Ginder solicited investors through television advertisements. Further, Ginder made material omissions in connection with the Sweet offering. For example, he failed to disclose that MLP had never met its projected oil and gas production estimates and had operated at a loss since its inception. He also failed to disclose that he had misappropriated $300,000 of MLP investor funds in order to make an unsecured non-interest bearing loan to a penny stock company in which he had an interest. These omissions are particularly material in light of the fact that the Sweet PPM states: "[NEGC] is currently the General Partner and a Limited Partner in Northamerican Energy Master Limited Partnership …. that currently owns and operates leases with a total of 64 wells in Pecos County, Texas." In fact, NEG, not NEGC, is the general partner of MLP. Further, even though NEGC is listed as the

General Partner of the partnership, Ginder has not set up a separate NEGC bank account. Instead, payments relating to offering costs from the Sweet partnership account to NEGC have been deposited into same "Jon Ginder d/b/a NEG" account that received funds from the MLP offerings.

## ONGOING ACTIVITIES

23. The NEG website continues to solicit investments. For example, the site contains the following statements:

- **Northamerican Energy Group's mission** is to provide low risk oil and gas investments via a direct participation program. These programs give the investor/partners a direct ownership position in the wells and leases from which they receive quarterly net revenue disbursements from the working interest income received by the Partnership.

- **Investing in Partnership** [c]ome and visit with us here in Houston and see first hand how we accomplish outstanding quarterly income for our partners. You'll be glad you did.

- **Private Placement Memorandum:** Current oil prices and the fact that we offer our investor/partners ownership in proven production allows us to offer returns far greater that they might be able to generate in the current stock market.

- Please contact us if you are interested in obtaining a Private Placement Memorandum package.

24. Further, Ginder continues to mislead investors and misuse investor funds. After repeated requests from investors, on July 19, 2010, Ginder finally mailed the 2010 first quarter report to MLP investors. The report discloses that during the quarter, the partnership sold three

*SEC v. Jon C. Ginder, et al.*
COMPLAINT
Page-11

additional partnership units for $60,000 each. At the time of their investment, Ginder failed to disclose to any of these investors that the partnership had been operating at a loss since the second quarter of 2008. While the report disclosed that the partnership had incurred a $144,000 net loss for the quarter, Ginder again failed to disclose to the new investors that the partnership had a cumulative operating loss of at least $700,000. In his cover letter, Ginder disclosed for the first time, that NEG "had chose to accrue a total of $258,988 in years ending 2008 and 2009 thus reducing the costs to [MLP]." He goes on to state that "unfortunately, we can no longer absorb these costs in 2010 and accordingly have billed MLP [$36,685]… and these costs are included in the enclosed 1st Quarter Partnership Financials." The accrued charges include $1,500 in monthly rental charges for the use of NEG's building that Ginder purchased with partnership funds. The report further reflects that NEG had borrowed an additional $46,000 from the partnership during the quarter, increasing its payable to the partnership to approximately $774,000. MLP investors have yet to receive a report for the 2010 second quarter.

## CLAIMS

### FIRST CLAIM
### Violations of Sections 5(a) and 5(c) of the Securities Act

25. Plaintiff Commission repeats and incorporates paragraphs 1 through 24 of this Complaint by reference as if set forth *verbatim*.

26. Defendants, directly or indirectly, singly or in concert with others, have been offering to sell, selling and delivering after sale, certain securities, and has been, directly and indirectly: (a) making use of the means and instruments of transportation and communication in interstate commerce and of the mails to sell securities, through the use of written contracts, offering documents and otherwise; (b) carrying and causing to be carried through the mails and in interstate commerce by the means and instruments of transportation, such securities for the

purpose of sale and for delivery after sale; and (c) making use of the means or instruments of transportation and communication in interstate commerce and of the mails to offer to sell such securities.

27. As described in paragraphs 1 through 24, Defendants' securities were offered and sold to the public through a general solicitation of investors. No registration statements were ever filed with the Commission or otherwise in effect with respect to these transactions.

28. By reason of the foregoing, Defendants violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§77e(a) and 77e(c)].

## SECOND CLAIM
### Violations of Section 17(a) of the Securities Act

29. Plaintiff Commission repeats and incorporates paragraphs 1 through 24 of this Complaint by reference as if set forth *verbatim*.

30. Defendants, directly or indirectly, singly, in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, have: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit.

31. As part of and in furtherance of this scheme, Defendants, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material fact and which omitted to state material facts necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading, including, but not limited to, those statements and omissions set forth in paragraph 1 through 24 above.

32. Defendants made the above-referenced misrepresentations and omissions knowingly or with severe recklessness with regard for the truth. Defendants were also negligent in their actions regarding the representations and omissions alleged herein.

33. By reason of the foregoing, Defendants violated, and unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5

34. Plaintiff Commission repeats and incorporates paragraphs 1 through 24 of this Complaint by reference as if set forth *verbatim*.

35. Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operate as a fraud and deceit upon purchasers, prospective purchasers and other persons.

36. As a part of and in furtherance of their scheme, Defendants, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading, including, but not limited to, those set forth in Paragraphs 1 through 24 above.

37. Defendants made the above-referenced misrepresentations and omissions knowingly or with severe recklessness regarding the truth.

38. By reason of the foregoing, Defendants violated and, unless enjoined, will continue to violate the provisions of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### RELIEF REQUESTED

The Commission seeks the following relief:

39. Emergency orders freezing the Defendants assets, ordering an accounting, directing defendants to preserve documents and appointing a receiver to take control of the Defendants assets to marshal and preserve those assets for the benefit of investors.

40. Orders of the Court preliminarily and permanently enjoining the Defendants, their agents, servants, employees, attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Sections 5(a), 5(c) and 17(a) of the Securities Act, [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], and Section 10(b) the Exchange Act, [15 U.S.C. § 78j(b)], and of Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

41. An order of the Court directing Defendants to disgorge an amount equal to the funds and benefits obtained illegally as a result of the violations alleged, plus prejudgment interest on that amount.

42. An order of the Court directing Defendants to pay civil monetary penalties in an amount determined as appropriate by the Court pursuant to Section 20(d) of the Securities Act

[15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] for their violations of the federal securities laws as alleged herein.

43. All further relief as the Court may deem just and proper.

DATED: August 11, 2010

Respectfully submitted,

/s/ Harold R. Loftin, Jr.
HAROLD R. LOFTIN, JR.
Attorney-in-charge
Texas Bar No. 12487090
S.D. Bar No. 16867
U.S. Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
(817) 978-6450
(817) 978-4927 (fax)
loftinh@sec.gov